## STATE V. SCOUGAL.

1. A franchise is a special privilege conferred by the government upon an individual or corporation, which does not belong to citizens of the country generally by common right.

2. At common law, the business of banking, in all its branches, was open and free to all, and belonged to the citizens of the country generally by common right. It did not constitute one of the prerogatives of the sovereign, or pertain to sovereignty.

3. The only banking privilege that is made a franchise in this country is the privilege of issuing bank-notes intended to circulate as money, which, since the adoption of the constitution of the United States, has existed in the national government, and, when not exercised by that government, could be exercised by the several states.

4. The business of banking "by discounting and negotiating promissory notes, bills of exchange, drafts, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, and by loaning money on personal security," was not a franchise at common law, and has not been made such by the state or national constitutions.

5. It is not a constitutional exercise of the legislative power to deprive the citizen of the right to carry on the business of banking,—other than that of issuing "bills or paper credit, designed to circulate as money," —which belongs to the citizens of the country generally by common right, and confer the exclusive privilege of carrying on such business upon corporations organized as provided by an act of the legislature, on the ground that such business is, or may be made, a franchise by legislative authority.

6. It is not a constitutional exercise of the legislative power, under the police power of the state, to deprive the citizen of the right to carry

on the business of banking by discounting negotiable paper, buying and selling exchange, receiving deposits, and loaning money on personal security, and confer such privilege exclusively upon corporations organized under an act of the legislature; such business of banking not being necessarily injurious to the community.

7. The banking act of this state, providing for the incorporation of banking associations, in so far as the same prohibits any individual or firm from transacting the banking business specified in subdivision 7 of section 4 of said act, without first complying with the provisions of the act, is in conflict with the provisions of section 18, art. 6, of the constitution of this state, which is as follows: "No law shall be passed granting to any citizen, class of citizens, or corporations, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

8. The said act, in so far as it prohibits individuals and firms from carrying on the business of banking, specified in said subdivision 7 of section 4 of said act, is in conflict with the provisions of section 1 of article 6 of the constitution of this state, which is as follows: "All men are born equally free and independent, and have certain inherent rights, among which are those of enjoying and defending life and liberty, of acquiring and protecting property, and the pursuit of happiness."

9. The said act, in so far as it prohibits individuals and firms from carrying on the business of banking, specified in said subdivision 7 of section 4 of said act, conflicts with section 2, art. 6, of the constitution of this state, which provides: "No person shall be deprived of life, liberty, or property without due process of law."

10. The said act, in so far as it prohibits individuals and firms who are citizens of the United States from carrying on the business of banking, specified in subdivision 7 of section 4 of said act, without first complying with the provisions of the act, is in conflict with the provisions of section 1, art. 14, of the constitution of the United States, which provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

(Syllabus by the Court. Opinion filed April 5, 1892.)

Error to Yankton county court. Hon. EDWIN T. WHITE, Judge.

Criminal action for violation of state banking law. Defendant demurred to information. Sustained. Plaintiff appeals. Affirmed.

The facts are fully stated in the opinion.

*Robert Dollard, Attorney General*, for plaintiff in error.

When a state adopts a particular statute from another state its judicial construction in the parent state is also adopted. Bond v. Appleton, 8 Mass. 472; Rutland v. Mendon, 1 Pick. 154; Com. v. Hartmett, 3 Gray, 450; Turnpike v. People, 9 Bush. 167; Campbell v. Quinlin, 4 Ill. 288; Little v. Smith, 5 Ill. 400; Ficher v. Deeming, 60 Ill. 114; Langdon v. Applegate, 5 Ind. 327; Fall v. Hazelrigg, 45 Ind. 576; Ingraham v. Regan, 23 Miss. 213; Adams v. Field, 21 Vt. 256; Drennan v. People, 10 Mich. 169; Harrison v. Sager, 27 Mich. 476; Paugborn v. Westlake, 36 Iowa, 546; Poertuer v. Russell, 33 Wis. 193; Myrick v. Wosey, 27 Me. 9; People v. Coleman, 4 Cal. 46; Beemis v. Becker, 1 Kan. 226; Walker v. Cincinnati, 21 Ohio St. 14; Hess v. Pegg, 7 Nev. 23; Freeze v. Tripp, 70 Ill. 496; *Ex parte* Mathews, 52 Ala. 51; Bradbury v. Davis, 5 Col. 265.

The state in the exercise of its police power has the right to regulate the business of banks of discount, deposit and exchange. Muglar v. Kansas, 123 U. S. 205; Minn. v. People, 94 U. S. 77; Baker v. State, 54 Wis. 368; Thorpe v. Railroad, 27 Vt. 143; Live Stock v. Crescent, 1 Abb. U. S. 398; Slaughter-House Case, 16 Wall. 36; Bartmeyer v. Iowa, 18 Wall. 129; McCrady v. Virginia, 94 U. S. 391; Beer v. Massachusetts, 97 U. S. 25; Bradwell v. State, 16 Wall. 130.

*Bartlett Tripp,* for defendant in error.

It is an unjust discrimination to grant privileges and immunities to citizens, classes and corporations, which, upon the same terms are not open to all. *In re* Jacobs, 98 N. Y. 98; People v. Marx, 99 N. Y. 377; Bristol v. Baker, 14 Johns. 206; Wilkenson v. Leland, 2 Pet. 657; Norwick City Gas Co., 25 Ct. 19; Slaughter-House Case, 16 Wall. 75; State v. Woodmance, 46 N. W. 970; Morse on Banking, 1; People v. Insurance Co., 15 Johns. 358.

It is an unlawful interference with the liberty and property of the citizen. *Ex parte* Garland, 4 Wall. 379; Cooley on Torts, p. 277; Corfield v. Corgell, 4 Wash. C. C. 380; Bertholf v. O'Reilly, 74 N. Y. 515; Barlamaqui, Pol. Law, c. 3, § 15; Cooley, Const. Lim. 745; Smith's Wealth of Nations, c. 10, part 2; 1 Shar. Bl. 127; 16 Wall. 110-119; 111 U. S. 757; Taylor v. Porter, 4 Hill, 147; Sinnickson v. Johnson, 2 Har. N. J. 129; Walling v. Kennedy, 2 Yerger, 554.

The legislature has no right to make unjust discrimination in the application or the execution of the law. Mayor v. Thorne, 7 Page, 261; Cooley, Const. Lim. 244; Hayden v. Noyes, 5 Conn. 391; Peck v. Lockwood, 5 Day, 22; Pearson v. Portland, 69 Me. 278; Holden v. James, 11 Mass. 396; Com. v. Worcester, 3 Pick. 462; Ward v. Barnard, 1 Aiken, 121; Lewis v. Webb, 3 Me. 326; Adams v. Smith, 6 Dak. 84; State v. Boyd, 5 Pac. 735; Com. v. Potter, 88 Pa. St. 260; Ziegler v. Geddis, 4 N. J. Laws, 365; State v. Pennoyer, 18 Atl. 878; People v. Phipps, 37 N. W. 888; Soon Hing v. Crowley, 113 U. S. 703; Yick Wo v. Hopkins, 118 U. S. 356.

The right to regulate under the police power does not give the right to prohibit or destroy. Railroad v. Minnesota, 134 U. S. 418; Stone v. Trust Co., 116 U. S. 320; Tiedman, Lim. Pol. 290-301; Millet v. People, 117 Ill. 382; People v. Common Council, 38 N. W. 470; State v. Goodwill, 33 W. Va. 179; Goodcharles v. Wigeman, 113 Pa. St. 431; People v. Otis, 90 N. Y. 48.

*Hugh J. Campbell*, for defendant in error.

Banking is a business and not a franchise. Curtis v. Leavitt, 15 N. Y. 60; Dearborn v. Bank, 42 Ohio St. 617; People v. Lowen-thal, 93 Ill. 191; Corwin v. Insurance Co., 14 Ohio, 13; Bank v. Hines, 3 Ohio St. 1; People v. Daly, 80 N. Y. 225; Pope v. Capital Bank, 20 Kan. 442; Com. v. Bearse, 42 Am. Dec. 457; 132 Mass. 542; California v. Central Pacific, 127 U. S. 21; Bank v. Fairbanks, 57 Cal. 196.

Under the police power of the state regulation and prohibition are two different subjects. People v. Beadle, 60 Mich. 272; *Id.* v. Gadway, 61 Mich. 285. The legislature has no power to prohibit occupations. Tiedman, Pol. P. § 102, p. 289; State v. Washington, 44 N. J. Laws, 605; State v. Goodwell, 10 S. E. 287; Rajio v. State, 6 S. W. 401; State v. Devine, 4 S. E. 477; *Ex parte* Westerfield, 55 Cal. 550; Davies v. McKeely, 5 Nev. 369; *Ex parte* Faulk, 42 Ohio St. 638. The title to chapter 27, Session Laws of 1891, is bad for duplicity. Mewheeler v. Price, 11 Ind. 199; Igoe v. State, 14 Ind. 239; Davis v. State, 61 Am. Dec. 345; Lauer v. State, 22 Ind. 461; State v. Bonne, 33 La. Ann. 981; Smails v. White, 4 Neb. 353; State v. Young, 47 Ind. 150; Walker v. State, 49 Ala. 329; Kuhns v. Krammers, 20 Ind. 490.

CORSON, J. This case comes before us on a writ of error issued on behalf of the state to the county court of Yankton county to review the judgment of that court sustaining a demurrer to the information filed against the defendant in error, and quashing the same. The legislature of this state at its last session passed an act for the organization of state banks, entitled ."An act to provide for the organization and government of state banks," approved March 10, 1891, and constitutes chapter 27 of the Laws of 1891. The first section of the act is as follows: "Associations for carrying on the business of banking under this title may be formed by any number of natural persons, not less than three (3), one-third of whom shall be residents of the state. They shall enter into articles of association, which shall specify in general terms the object for which the association is formed, and may contain any other provisions not inconsistent with law, which the association may see fit to adopt for the regulation of its business and the conduct of its affairs. These articles shall be signed by the persons uniting to form the association, and a copy of them shall be forwarded to the secretary of state of the state of South Dakota." The second section provides what the certificate of incorporation shall contain, and the third section provides for the manner of its execution, filing, etc. The fourth section confers upon such corporations or associations the following powers: (1) To adopt and use a corporate seal; (2) to have succession for 20 years; (3) to make contracts; (4) to sue and be sued; (5) to elect officers, and prescribe their duties; (6) to make by-laws to govern and control the business; and (7) "to exercise by its board of directors or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, bills of exchange, drafts, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, by loaning money on personal security. * * *" And section 27 provides as follows: "It shall be unlawful for any individual, firm, or corporation to continue to transact a banking business, or to receive deposits, for a period longer than six months immediately after the passage and approval of this act, without

first having complied with and organized under the provisions of this act. Any person violating the provisions of this section, either individually or as an interested party in any association or corporation, shall be guilty of a misdemeanor, and, on conviction thereof, be fined not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the county jail not less than ninety days, or either or both, at the discretion of the court." These are all the provisions of the law that it is necessary to give to a proper understanding of the questions presented for our decision.

On the 22d day of September, 1891, the state's attorney filed an information against the defendant in error in the county court of Yankton county, containing 11 counts, charging him in the various counts with carrying on the business of banking "discounting and negotiating promissory notes, bills of exchange, drafts, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, by loaning money on personal property," without having complied with the provisions of the banking act. A demurrer was interposed to each count of the information on the ground that it did not state facts sufficient to constitute a public offense. The demurrer was sustained by the county court, and judgment rendered quashing the information. The principal ground relied on to sustain the demurrer and judgment of the court below is the unconstitutionality of section 27 of the act, under which the information was filed, and this presents the only question we shall discuss or consider, as the other objections to the information were purely technical, and, in our opinion, are without merit.

The learned attorney general contends—First, that the privilege of banking is or may be made by the legislature a franchise, and as such is subject to the control of the legislature of the state, and that, it being a franchise, or made such, the legislature has the power of conferring upon or granting the privilege to such persons, associations, and corporations as it may deem proper, and of excluding all other persons from the exercise of such privilege; and second, if the privilege of banking is not a franchise, and cannot be made such by the legislature, then the legislature, by virtue of

the police power vested in the state, may regulate the business, and may, under such power, prescribe the manner in which the business shall be conducted, and may exclude all persons from exercising the privilege of banking, except in the manner prescribed by the law.

The learned counsel for the defendant in error contend: First. That only the banking privilege proper, namely, the privilege of issuing demand notes to circulate as money, or, as defined in the state constitution, the power "to issue bills or paper credit, designed to circulate as money," constitutes, or can by legislative power be made, a franchise, and that carrying on a banking business by exercising the incidental powers of banking specified in subdivision 7 of section 4 of the act, is a right belonging to the citizens of the country generally, and not a franchise, and cannot be made such by legislative power. Second. That under the police power vested in the state the legislature may regulate, but it cannot prohibit or destroy, a business, calling, or occupation, not necessarily offensive to the senses, injurious to the health, or otherwise detrimental to the public interest; that it is only trades, occupations, and pursuits that are at all time, and under all circumstances necessarily offensive to the community, or injurious to society, that can be absolutely prohibited by legislative action; and that, as the business of banking is not of this character, the legislature cannot prohibit individuals from pursuing it, though, like all other classes of business, it may be regulated. And, third, they further contend that the act conflicts with sections 1, 2 and 18 of article 6 of the state constitution, and section 1, art. 14, of the constitution of the United States, in that the law makes an unjust discrimination in granting privileges and immunities to citizens, classes, and corporations which, upon the same terms, are not open to all, in that the law, and particulary section 27, is an unlawful interference with the liberty and property of the citizen; in that it discriminates against the individual citizen by conferring upon corporations the right to transact a banking business, and prohibiting the same privilege to such individual citizen; and in that the act deprives the individual citizen of his right to pursue a lawful calling, occupation, or business which is inoffensive, and not injurious to the community.

1. Are the incidental powers of banking conferred upon corporations by subdivision 7 of section 4 franchises; or has the legislature power to make them such, and to prohibit individual citizens from exercising them? What is a franchise? Blackstone defines it "as a royal prerogative, or branch of the king's prerogative, subsisting in the hands of a subject." 2 Bl. Comm. 37. Chief Justice TANEY defines them as follows: "Franchises are special privileges conferred by government upon individuals which do not belong to citizens of the country generally by common right. It is essential to the character of a francise that it should be a grant from the sovereign authority, and in this country no franchise can be held which is not derived from the law of the state." Bank v. Earle, 13 Pet. 595. The qualification by the chief justice, "which does not belong to the citizens of the country generally by common right," is an important one, and constitutes the distinguishing feature of a franchise. What is meant by this qualification is made clear by Mr. Justice BRADLEY, in a recent case decided by the supreme court of the United States. After quoting the above definition of a franchise, given by Blackstone, he says: "No private person can establish a public highway, public ferry, or railroad, or charge tolls for the use of the same, without authority from the legislature, direct or derived. These are franchises. No person can take another's property, even for public use, without such authority; which is the same as to say that the right of eminent domain can only be exercised by virtue of a legislative grant. This is a franchise. No persons can make themselves a body politic without legislative authority. Corporate capacity is a franchise." California v. Central Pac. R. Co., 127 U. S. 40, 8 Sup. Ct. Rep. 1073. Of course, as the learned judge says, this list might be continued indefinitely. But this quotation clearly illustrates the nature of a franchise. Over all public property, highways, navigable rivers, and seas, over everything that belongs to the sovereign, the power of the government is absolute, whether that power is derived from the common law or from the state or the national constitution. When, therefore, the state grants a right thus belonging to the government, and not to the citizens generally as a matter of right, it is the grant of a franchise. But

at common law, banking in all its branches was free to all, and belonged to the citizens of the country generally. In 1694 the British parliament chartered the Bank of England, and conferred upon that bank the power to issue demand notes to circulate as money, and prohibited large copartnerships and associations from issuing such notes; and by our national constitution the power to regulate the currency was conferred upon the national government. On the argument of the case of Bank v. Earle, *supra*, Mr. Webster, in the course of his argument, after giving the history of banking in England and in this country, said: "So that the banking privilege of the Bank of England consisted simply in the privilege of issuing notes for circulation, while the privilege is forbidden to all other corporations and all large copartnerships or associations." And in defining banking powers properly belonging to a bank he said: "What is that, then, without which any institution is not a bank, and with which it is a bank? It is the power to issue promissory notes with a view to their circulation as money." It has long been settled in this country that the privilege of issuing demand notes to circulate as money was a franchise,—a public right, belonging to the national government, that might be granted by congress to individuals or corporations, and, when not exercised by the national government, might, like many other powers vested in the national government, be exercised by the state governments. In an early case before the supreme court of the United States, Mr. Justice STORY, in a dissenting opinion, said: "The states may create banks as well as other corporations upon private capital, and, so far as this prohibition is concerned, (the prohibition against remitting bills of credit by the state,) may rightfully authorize them to issue bank bills or notes as currency; subject always to the control of congress, whose powers extend to the entire regulation of the currency of the country." Briscoe v. Bank, 11 Pet. 257, 349. This view of the power of the national government to regulate and to provide a national currency, and grant the privilege to corporations, and to prohibit all not authorized to exercise the franchise, was affirmed by the United States supreme court in Bank v. Fenno, 8 Wall. 533. The chief justice, in delivering the opinion of the

court, says: "Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it cannot be questioned that congress may, constitutionally, secure the benefit of it to the people by appropriate legislation. To this end, congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community. To the same end, congress may restrain, by suitable enactments, the circulation as money of any notes not issued under its own authority. Without this power, indeed, its attempts to secure a sound and uniform currency for the country must be futile." When, therefore, banking is said to be a franchise, it must, we think, be understood as referring to the privilege of issuing demand notes to circulate as currency. Judge Cooley, in speaking of bank currency, in a note to Cooley's Blackstone, says: "These securities are designed to circulate as money, and they are not allowed to be issued except by persons duly authorized by statute." 2 Cooley's Bl. p. 469, note 21.

"Banking powers," when used in state constitutions, have been construed by several state courts to mean the power to issue notes to circulate as money. It is provided by the constitution of the state of Ohio that "no action of the general assembly authorizing associations with banking powers shall ever take effect," etc., until submitted to a vote of the people. The supreme court of that state in a late case says: "The statute in question does not assume to authorize the making or issuing of bills or notes to circulate as money, and the question is submitted for our determination whether it is within the meaning of the constitution." After an able discussion of the question, the court concludes that the phrase, "associations with banking powers," relates only to banks of issue. Dearborn v. Bank, 42 Ohio St. 617. The same view was taken of the clause "with banking powers," in the constitution of Illinois. People v. Loewenthal, 93 Ill. 191. To the same effect is the decision of the Kansas supreme court as to the term "banks and currency." Pape v. Bank, 20 Kan. 440. Mr. Chief Justice TANEY, in Bank v. Earle, *supra.* commenting on the case, State v. Stebbins, 1 Stew. (Ala.) 312, says: "We are fully

satisfied that the state never intended by its constitution to interfere with the right of purchasing and selling bills of exchange, and that the opinion of the court does not refer to transactions of this description when speaking of banking as a franchise." We conclude our quotations as to the meaning of the term "franchise," as applied to banking powers, by a reference to our own constitution. All the provisions referring to banking in that instrument are contained in article 18, and embrace three sections. The first is as follows: "If a general banking law shall be enacted, it shall provide for the registry and countersigning by an officer of this state of all bills or paper credit designed to circulate as money, and require security to the full amount thereof, to be deposited with the state treasurer, in the approved securities of the state or of the United States, to be rated at ten per centum below their par value; and, in case of their depreciation, the deficiency shall be made good by depositing additional securities." The second section limits the term of the duration of state banks, and section 3 defines the liability of stockholders. It will be observed that the only banking power referred to in the article is the power of issuing "bills or paper credit designed to circulate as money." This, then, is the only banking power made a franchise under our constitution. All the other or incidental powers of banking are left to citizens as held by them at common law. And it may be proper to observe that in neither the charter granted by the British parliament to the Bank of England, nor in the national banking law of the United States, is there any prohibition of the privilege of carrying on the business of banking, other than issuing demand notes to circulate as money, by any individual, copartnership, or corporation. These are all left free to pursue the business of banking as specified in section 27 of the act under consideration. No one will, we apprehend, controvert the proposition that under the common law banking in all its branches was absolutely free to all. We have seen in what manner and when the privilege of issuing bank-bills to circulate as money became a franchise in this country. But as to the other or incidental powers of banking, specified in subdivision 7, § 4, we are unable to find that they ever became, either at common law or under the

state or national constitution, a franchise. These are privileges that always belonged to the citizens of the country generally. They never belonged to the sovereign, or pertained to sovereignty in any manner. They have never been conferred upon the national government or the state government. Whence, then, did the legislature of this state derive its power to farm out these privileges to corporations, and to deny to the individual citizen the right to exercise them, which he and his ancestors have from time immemorial possessed? Can the legislature create a franchise by depriving citizens of their rights, and then bestow it upon another at will? If it can, then the citizen has no rights that may not be taken from him under this new theory of a franchise created by the legislature. Concede to the legislature the right to make the incidental powers of banking a franchise, under what principle of law can it be deprived of the power of making merchandising, blacksmithing, or farming a franchise, and conferring the privilege upon corporations only? In our opinion, no such power exists in the legislature as that of creating a franchise out of the natural and common rights of the citizens. It must derive such power from the royal prerogatives of the sovereign of that country from whence our system of law is taken, or from the state or national constitution. In this case no such authority is shown. Hence we conclude that the individual citizen cannot be deprived of a right always possessed by him,—of conducting a banking business, and exercising all the privileges of banking, except that of issuing currency, and that right conferred upon corporations created by such legislature upon the theory that such a privilege is a franchise. From such an invasion of his rights the citizen is protected by the constitution of the state. His right to liberty and property is held sacred under that constitution, and, unless he can be deprived of these rights by the lawful exercise of the police power of the state, the prohibition contained in the twenty-seventh section of the act is unwarranted and void. These constitutional provisions will be discussed more fully under the third proposition of counsel for the defendant in error.

2. This brings us to the consideration of the police power of the state. Is it competent for the legislature, under that power,

to deprive the individual citizen of his common-law right to carry on the business of banking by discounting paper, buying and selling bills of exchange, receiving deposits, and loaning money? The police power is defined by Judge Cooley as follows: "The police power of the state, in a comprehensive sense, embraces the whole system of internal regulations by which the state seeks not only to preserve the public order, and to prevent offenses against the state, but also to establish for the intercourse of the citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as it is reasonably consistent with a like enjoyment of rights by others." Cooley, Const. Lim. 706. This power, extending as it does to the protection of life, health, comfort, and quiet of all persons, and the protection of all property within the state, is still possessed by the state, subject to the provisions of the constitutions, state and national. According to the maxim, *sic utere tuo ut alienum non laedas*, it must be within the range of legislative action to define the mode and manner in which one may so use his own as not to injure others, subject to the provisions of the constitutions, state and national, and to those great fundamental principles enunciated in the Declaration of Independence. But under this power it is not competent for the state to prohibit the citizen from carrying on any trade, occupation, or business that is not offensive to the community, or injurious to society. The business may be regulated, but not prohibited. Mr. Tiedeman, in his excellent work on the Limitations of Police Powers, says: "In order to prohibit the prosecution of the trade altogether, the injury to the public which furnishes the justification for such a law must proceed from the inherent character of the business. Where it is possible to conduct the business without harm to the public, all sorts of police regulations may be instituted which may tend to suppress the evil. License may be required, the most rigid system of police regulations may be established, and heavy penalties may be imposed for the infraction of the law; but, if the business is not harmful, the prosecution of it cannot rightfully be prohibited to

one who will conduct the business in a proper and circumspect manner. Such a one 'would be deprived of his liberty without due process of law.'" Tied. Lim. p. 290. Again, the same author says: "It has been demonstrated and satisfactorily explained in its application to a sufficient number of parallel and similar cases, in order to lay it down as an invariable rule, that no trade can be subjected to police regulation of any kind unless its prosecution involves some harm or injury to the public or third persons, and in any case the regulation cannot extend beyond the evil which is to be restrained. It has also been maintained, and I think satisfactorily established, that no trade can be prohibited altogether, unless the evil is inherent in the character of the trade, so that the trade, however conducted, and whatever may be the character of the person engaged in it, must necessarily produce injury upon the public or upon individual third persons." *Id.* p. 301. It necessarily follows from the rules above laid down that, if a business is offensive to the community, or injurious to society, and is to be prohibited, it must be prohibited as to all. If it is regulated and controlled, it must be so regulated and controlled as to leave the business or calling free, under such restraints as the legislature may impose, to be exercised alike by all. The government, under the guise of regulation, cannot prohibit or destroy. It cannot deprive any citizen of his right to pursue a calling, occupation, or business, not necessarily injurious to the community, who is willing to comply with all reasonable regulations imposed upon it. It can never encroach upon the liberty of the citizen or invade the rights of property protected by the constitution. *In re* Jacobs, 98 N. Y. 98. By the act in question the state admits that banking is not, of itself, injurious to the community, as it confers upon corporations that may be organized under the act full power to carry on the business of banking as provided in the act; and the number of banking corporations that may be organized is not limited. It also permits individual citizens in towns containing less than 500 inhabitants to exercise the right of banking, as specified in subdivision 7, § 4, under certain regulations in the act contained. But by section 27 the state says individual citizens, either as individuals or copartnerships, except in towns of less than 500 popula-

tion, are in the future prohibited from conducting the business of banking in any of its branches. The artificial persons created by the act may carry on the business, but no natural person shall be permitted to do so. The banker, therefore, who has devoted years to the acquisition of that knowledge of the business that enables him to conduct it successfully, who has invested his means in a banking building, vaults, furniture, etc., and who has invested his capital in the business of banking, must close his bank, and find other employment for his capital, other occupations in which to employ his talents and abilities, and other methods for providing for the support of himself and family. If the police power of the state is as broad and comprehensive as claimed by the learned attorney general, the citizen holds his right to liberty, to his property, and to the pursuit of happiness at the will of the legislative power alone. But the rights of the citizen are not thus left to the will of the law-making power. The state constitution and the national constitution have placed around the rights of the citizen safeguards that protect them from invasion by legislative action.

3. The constitutional provisions more directly bearing upon the questions being discussed are as follows: Section 18, art. 6, reads as follows: "No law shall be passed granting to any citizen, class of citizens, or corporations, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Section 1 of the same article is as follows: "All men are born equally free and independent, and have certain inherent rights, among which are those of enjoying and defending life and liberty, of acquiring and protecting property, and the pursuit of happiness. * * *" Section 2 of the same article provides: "No person shall be deprived of life, liberty, or property without due process of law." And section 1, art. 14, of the constitution of the United States provides: "* * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law." These constitutional provisions are not mere "glittering generalities," but constitute sacred guaranties to the citizen

that his liberty and his right to the pursuit of happiness shall not be abridged, and his right to his property shall not be invaded by the legislative power, except so far as authorized by the sovereign power as expressed in constitutional provisions, or by due process of law. What are "privileges and immunities" which the legislature is prohibited from granting to any citizen, class of citizens, or corporations, which shall, upon the same terms, equally belong to all citizens or corporations? The most satisfactory definition of this clause that we have noticed is that of Mr. Justice WASHINGTON in Corfield v. Coryell, 4 Wash. C. C. 380. In discussing the clause "privileges and immunities," he said he had "no hesitation in confining these expressions to those privileges and immunities which were, in their nature, fundamental, which belong of right to citizens of all free governments, and which have at all times been enjoyed by the citizens of the several states which compose the Union, from the time of their becoming free, independent, and sovereign;" and, considering these privileges, he said they might be "all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole." In commenting upon this opinion, Mr. Justice FIELD, in his opinion in the Slaughter-House Cases, said: "This appears to me to be a sound construction of the clause in question. The privileges and immunities designated are those which of right belong to the citizens of all free governments. Clearly, among these must be placed the right to pursue a lawful employment in a lawful manner without other restraints than such as equally affect all persons." Slaughter-House Cases, 16 Wall. 97. By section 27 of the act we are considering, the privileges and immunities of transacting a banking business, as defined in the act, are conferred upon corporations alone, organized under the act, except in towns containing less than 500 inhabitants. In all other places the individual citizens are prohibited from transacting such banking business, as they cannot as individuals comply with the terms of the

act. It is contended that citizens may associate themselves together, and become a corporation, under the act, and, as such corporation, transact the business. This is true; but can the citizen be required to abandon a business, not necessarily injurious to the community, which he is carrying on, and be required to invest his capital in a corporation over which he may have no control, except as a mere stockholder, or otherwise be deprived of his right to pursue his lawful calling? Are not privileges and immunities granted by the act to corporations that are denied to individual citizens? It may be contended that there is no discrimination as between corporations; that all corporations organized under the act are granted the same privileges and immunities, and that this satisfies the constitutional provision. But this is too narrow a construction of this important constitutional provision, intended for the protection of the rights of the citizen. In law, a corporation is a citizen of the state of its creation, and for many purposes a person in law also. When these privileges are conferred upon private corporations, which at common law belong to the citizen, and the same privilege is denied to the individual citizen, this provision of the constitution, in our opinion, is violated.

But we will proceed to consider the other important constitutional provisions contained in the first and second sections of the article. The right of "enjoying and defending life and liberty, of acquiring and protecting property, and the pursuit of happiness," includes the right to pursue any lawful calling, occupation, or business, and the right to choose the means of acquiring property and the pursuit of happiness, not inconsistent with constitutional provisions or the rights of others. The term "liberty," as used in the constitution, does not mean mere freedom from arrest or restraint, but it means liberty in a broader and more comprehensive sense. It means freedom of action; freedom in the selection of a business, calling, or avocation; freedom in the control and use of one's property, so far as its use is not injurious to the community, and does not infringe the rights of others; freedom in exercising the rights, privileges, and immunities that belong to citizens of the country generally; and freedom in the pursuit of any lawful business or calling selected by him. Of but little value to the citizen

could be these provisions of the constitution, if the state, through the legislative power, could, at its mere will and pleasure, deprive him of his right to pursue any lawful business or calling not offensive or injurious to the community, and which does not interfere with the equal rights of others, and the right to pursue which he has derived from the common law. So, too, it may be said of that other important constitutional provision: "No person shall be deprived of life, liberty, or property without due process of law." Speaking of this provision, Judge Cooley says: "What the legislature ordains and the constitution does not prohibit must be lawful. But if the constitution does no more than to provide that no person shall be deprived of life, liberty, or property except by due process of law, it makes an important provision on this subject, because it is an important part of civil liberty to have the right to follow all lawful employments." Cooley, Torts, p. 277. In these constitutional provisions are found the guaranties to the citizen of his right to liberty, his right to the pursuit of happiness, his right to pursue in his own way any lawful business or calling, and his right to property, as well as from those great fundamental principles that underlie our system of government. Mr. Justice WASHINGTON, in the case before cited, in speaking of the rights of the citizen independent of constitutional provisions, says: "No proposition is more firmly settled than that it is one of the fundamental rights and privileges of the American citizen to adopt and follow such lawful industrial pursuits, not injurious to the community, as he may see fit." Corfield v. Coryell, *supra.* Mr. Justice ANDREWS, in delivering the opinion of the court in Bertholf v. O'Reilly, 74 N. Y. 509, says: "The right to liberty includes the right to exercise his faculties, and to follow a lawful avocation for the support of life."

The case of *In re* Jacobs, 98 N. Y. 98, deserves more than a passing notice. This case involved the right of a citizen to pursue his ordinary calling, of which the legislature by a law sought to deprive him. An act was passed by the legislature of the state of New York, in which it was made unlawful for any person to manufacture cigars, etc., on any floor or part of a floor in a tenement-house occupied as a home. Jacobs was indicted for a viola-

tion of the act, and the question presented was "whether or not the act creating the offense was a constitutional exercise of the legislative power." Mr. Justice EARLE in delivering the opinion of the court, discussed very fully the powers of the legislature under the constitution of New York, and the police power of the state. In speaking of "liberty," as used in the constitution, he says: "So, too, one may be deprived of his liberty, and his constitutional rights thereto violated, without the actual imprisonment or restraint of his person. Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights, which limit one in his choice of a trade or profession, or confine him to work or live in a specified locality, or exclude him from his own house, or restrain his otherwise lawful movements, (except as such laws may be passed in the exercise by the legislature of the police power, which will be noticed later,) are infringements upon his fundamental rights of liberty which are under constitutional protection." The court held the law unconstitutional.

People v. Marx, 99 N. Y. 377, 2 N. E. Rep. 29, is another important case involving the right of a citizen to carry on the business of manufacturing oleomargarine, which the legislature of the state had declared unlawful. The power of the legislature over the business of the citizen was again discussed by RAPALLO, J. After quoting the sections of the constitution of that state bearing upon the question, he says: "These constitutional safeguards have been so thoroughly discussed in recent cases that it would be superfluous to do more than to refer to the conclusions that have been reached bearing upon the questions under consideration. Among these no proposition is more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit." And that law was also held unconstitutional.

In Butchers' Union Slaughter-House Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 4 Sup. Ct. Rep. 652, Mr. Justice FIELD says that among the inalienable rights as proclaimed in the Declaration of Independence "is the right of men to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their property or develop their faculties, so as to give them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocent in themselves, and have been followed in all communities from time immemorial, must, therefore, be free in this country, to all alike, upon the same terms. The right to pursue them without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright." In the same case Mr. Justice BRADLEY says: "I hold that the liberty of pursuit, the right to follow any of the ordinary callings of life, is one of the privileges of a citizen of the United States," of which he cannot be deprived without invading his right to liberty within the meaning of the constitution.

In the Slaughter-House Cases, 16 Wall. 116, Mr. Justice BRADLEY says: "For the preservation, exercise, and enjoyment of these rights the individual citizen, as a necessity, must be left free to adopt such calling, profession, or trade as may seem to him most conducive to that end. Without this right he cannot be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property and right. Liberty and property are not protected where these rights are arbitrarily assailed."

It will thus be seen that the citizen's right to pursue any lawful business is more than a mere right; it is property that cannot be taken from him "without due process of law." But the law in question does more than deprive a citizen of his occupation. It actually takes from him his right not only to continue the business of banking, but it deprives him of his property employed in his business. The vaults, safes, and bank furniture of the banker

may become comparatively valueless for other purposes. Yet, whatever that loss by diminution in value may be, it is property taken from him without "due process of law." It is not the question of how much or how little the loss to the citizen may be. It is a question of the power of the legislature to deprive a citizen of his property. If the power exists to take any, it would be difficult to fix the limit. Millett v. People, 117 Ill. 294, 7 N. E. Rep. 631.

It is further contended that if the business of banking other than the issue of demand notes to circulate as currency, is not a franchise, and the business cannot be prohibited under the police power, still such banking is affected with a public use, so that it may be regulated by law like public warehouses, as held in Munn v. Illinois, 94 U. S. 113. The decision in that case was based upon the principle that all shippers of grain through the city of Chicago were of necessity compelled to make use of the warehouses of the city as a means of transhipment of the same. These warehouses stood "in the gateway of commerce," and their owners exacted toll of all who were thus of necessity compelled to use them. Certainly such a business might well be held to be clothed with a public interest, and, like the business of the innkeeper, common carrier, miller, etc., subject to the control of the state. But the state of Illinois did not prohibit any citizen from carrying on the warehouse business. It subjected those engaged in the business to such regulations as the state deemed necessary, by requiring warehousemen to take out a license, give bond, etc. We are unable to discover any similarity between the business of the private banker, in discounting paper, buying and selling exchange, loaning money, or receiving deposits, and warehousemen, common carriers, innkeepers, etc. No one is required to do business with a private banker, any more than with the merchant or the manufacturer. But, assuming that the business of banking we are now considering is clothed with such a public use that it may be controlled by the state, (and we think it is so affected with a public interest,) still it does not follow that the citizen may be deprived of the right to carry on the business. This, like any other business, may be

subjected to reasonable regulations, which shall alike apply to all citizens and corporations.

The attorney general relies mainly for a reversal of the judgment of the court below upon the authority of Morse on Banking, (3d Ed.) § 13, and the cases referred to by him, and the decision of the supreme court of North Dakota in State v. Woodmanse, 46 N. W. Rep. 971. The cases cited by Mr. Morse as supporting the propositions laid down by him are mainly cases decided in the state of New York; and all except Curtis v. Leavitt, 15 N. Y. 9, were decided over half a century ago. Assuming that they do support the propositions laid down by Mr. Morse, (of which, after a careful examination, we are left somewhat in doubt,) still we do not think that these authorities should control this court in the decision of this case. Neither the constitutional provisions in force in that state, nor the laws under which the decisions were made, are accessible to us, and hence we are unable to determine what they were. In neither of the cases cited was the constitutionality of the laws then being considered raised or passed upon by the court. It would also seem from the decisions that private banking was neither prohibited nor restrained at that time. Bristol v. Barker, 14 Johns. 205. In 1837 all laws restraining banking, except as to the issuing of demand notes intended to circulate as money, were repealed. Curtis v. Leavitt, *supra*. Since those early decisions in New York, the rights of individual citizens to engage in and carry on any lawful pursuit or calling, and the limitations imposed upon the legislative power by the provisions contained in the more modern constitutions, have been very fully discussed and considered in numerous cases, both in the state and federal courts, and the principles governing the rights of individuals, and the legislative power over such rights, have become quite well settled. The earlier New York cases—if they assert the doctrine claimed for them—could hardly be reconciled with the later cases of *In re* Jacobs, *supra*, and People v. Marx, *supra*, as to the right of the citizen to pursue any lawful business, subject only to proper regulations by the legislature. The case of Nance v. Hemphill, 1 Ala. 551, and the case cited from 8 Tex., (State v. Williams, 8 Tex. 255,) have not been examined by us. We conclude, however, that, as digested, they are not very important to

the decision of this case.    The only modern case that seems to support the position of the attorney general is that of State v. Woodmanse, *supra*.    But, notwithstanding our very high appreciation of the decisions of that court, we are unable to reach the same conclusions that that court has arrived at upon the constitutionality of a law which is said to be quite similar to the one now before us.

Our conclusions are that the legislature exceeded its powers in attempting to prohibit all individual citizens of this state from continuing to carry on the business of banking as conferred upon corporations by subdivision 7, § 4, of the act under consideration; and that section 27 of said act, which provides that "it shall be unlawful for any individual, firm, or corporation to continue to transact a banking business, or to receive deposits," etc., "without first having complied with the provisions of this act," so far as said act affects individual citizens, is in conflict with the provisions of the constitution of this state, and therefore void.    This decision is not intended to in any manner affect the remaining provisions of said act, or of said section 27, except so far as it prohibits any individual or firm from transacting such banking business as is authorized by the act; that being the only question raised in this case or considered by the court.    The judgment of the court below is affirmed.    All the judges concur.