In the Matter of the Application of **SOUTHERN HILLS BANK OF EDGEMONT to Move its Main Office.**

Nos. 13738, 13743.

Supreme Court of South Dakota.

Argued Nov. 18, 1982.

Decided Oct. 26, 1983.

William J. Srstka, Jr. of Duncan, Olinger, Srstka, Lovald & Robbennolt, P.C., Pierre,

for applicant-appellee Southern Hills Bank of Edgemont.

Gary J. Pashby of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for intervenor-appellant Custer County Bank; Terry N. Prendergast of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, on brief.

Wallace A. McCullen of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for intervenor-appellant First Federal Sav. and Loan Ass'n.

HENDERSON, Justice (on reassignment).

Appellee Southern Hills Bank of Edgemont (Southern Hills Bank) filed an application with the South Dakota Banking Commission (Commission) seeking permission to move its main office from Edgemont, South Dakota, to Custer, South Dakota. Appellants Custer County Bank and First Federal Savings and Loan Association of Rapid City (First Federal Savings) intervened to oppose the application. Following a two-day hearing, the Commission approved appellee Southern Hills Bank's application, whereupon appellants appealed to the circuit court. On February 3, 1982, the circuit court entered an order affirming the Commission's action. Appellants filed a notice of appeal to this Court. We affirm.

Appellants' issues on appeal include: (1) Was the Commission's decision clearly erroneous or beyond statutory authority? (2) Did Southern Hills Bank's application attempt to establish a branch bank in Custer in violation of SDCL 51–20–4? (3) Were appellants' due process rights violated by the Commission's failure to require identification of the new bank's directors and admitting into evidence the Director of the Division of Banking and Finance's report which contained deletions?

A bank is an important member of a community. As Justice Story wrote during the inceptual years of the United States Supreme Court: "[A] bank, whose stock is owned by private persons, is a private corporation, although . . . its objects and operations partake of a public nature." *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 669, 4 L.Ed. 629, 667 (1819) (Story, J., concurring). *See also, Wall v. Fenner,* 76 S.D. 252, 76 N.W.2d 722 (1956); *State v. Scougal,* 3 S.D. 55, 75, 51 N.W. 858, 865 (1892) (for South Dakota decisions recognizing that banking is "affected with a public interest").

During the Commission hearing, Gordon Dretsch, executive vice president of Custer County Bank, acknowledged that Custer County was one of the fastest growing counties in South Dakota. Finding of Fact four of the Commission states in part: "The 1980 census figures show that Custer County is one of the fastest growing counties in the State of South Dakota." Mr. Dretsch also admitted that business in Custer County had not been bad during the five years prior to the hearing. Finding of Fact three of the Commission provides in part: "Custer, South Dakota, is an important shopping and business center for Custer County, and other surrounding counties and communities and other adjacent areas in all directions, and has and continues to have an excellent business development and growth." An expanding population and solid business base were both factors in favor of Southern Hills Bank's application before the Commission. These factors were critical in *In re Am. State Bank, Pierre,* 254 N.W.2d 151 (S.D.1977) and *Valley State Bank of Canton v. Farmers State Bank,* 87 S.D. 614, 213 N.W.2d 459 (1973).

Evidence at the hearing convincingly established that Custer County Bank made handsome returns on the assets it garnered from the public in Custer County. Rather than invest most of its nonloaned Custer County capital back into the Custer County area, this bank chose to primarily invest in government securities, federal funds, and highly rated municipal bonds. In loaned money, South Dakota banks from 1976–1980 had an average loan-to-deposit ratio of 49 to 57%. Custer County Bank had a below average loan-to-deposit ratio of 34.5% in 1976; 40.6% in 1977; 40.3% in 1978; close to 45% in 1979; and 38% in 1980. In contrast, during the same time period, South-

ern Hills Bank, the applicant, had a loan-to-deposit ratio of 55 to 64%.

Custer County Bank did not make Federal Housing Administration loans to help local people get housing. Nor did Custer County Bank make Veteran's Administration loans for housing to aid returning veterans from the armed forces. Custer County Bank did not offer loans designed to help rural-oriented families get started in life. All applications for loans of this type were referred directly to Farmers Home Administration. Custer County Bank did not participate in State Housing Authority loans to aid local people in securing low-interest loans to build homes. Perhaps most dramatically, Custer County Bank did not cultivate the future of the youth of Custer County, as the Bank failed to offer student loans.

It was established that Custer County Bank failed to offer consistent overdraft protection for its customers. Mr. Dretsch, of Custer County Bank, candidly admitted Custer County Bank had not made any significant improvements to its physical plant over the ten-year period prior to the hearing. Examples: no drive-in or walk-up facilities to service the people. Finding of Fact twelve of the Commission expresses in part: "The evidence shows that the present financial institutions, and primarily the Custer County Bank, is not competitive in all respects of the banking industry, and in fact does not perform some of the services ordinarily performed by a full service bank."

 Mr. Robert Cullum, a twenty-year resident of Custer and president of one of Custer County's larger employers, Pacer Corporation, testified that he encountered numerous difficulties with Custer County Bank over Pacer's impress payroll account. Although Mr. Cullum had a $10,000.00 guarantee for his payroll, his employees, members of Custer County's public, had difficulties cashing their payroll checks at Custer County Bank. Mr. Mike Carter, who runs the Coast-to-Coast Hardware Store across the street from Custer County Bank testified: ,

Well, whenever somebody comes to town and doesn't have a checking account here, I know on Friday afternoons, I spend most of my time as a banking facility, trying to cash those checks for those people, and if they've got to go out of town to do their banking, it seems to me like they're also going to do their shopping in the same place.

Mr. Eugene A. Erickson, of Southern Hills Bank, testified: "Our research indicates that somewhere around half of the people—half of the people in Custer bank other than at Custer County Bank." This is expressly found in Finding of Fact thirteen by the Banking Commission: "The Commission finds that approximately one-half of the banking in Custer now goes elsewhere and that the loan to deposit ratio of the Custer County Bank is low as compared to the loan to deposit ratio of the State of South Dakota as a whole, and it has historically been lower than the South Dakota average."

As we held in *Valley State Bank*, 213 N.W.2d at 465–66:

The legislature has recognized that the expertise required in some fields of legislative authority is better left to qualified administrators who have refined abilities in narrow areas, controlled only by general guidelines established by the legislature. *Affiliated Distillers Brands Corp. v. Gillis*, 1964, 81 S.D. 44, 130 N.W.2d 597. The administrative agency must, however, lend credence to the guidelines established in the statutes which give rise to its existence.*

A ruling or decision of an administrative agency is upheld unless we find, in light of the entire record, the decision is clearly erroneous or we are left with a definite conviction that a mistake has been made. *Dakota Harvestore v. S.D. Dep't of Reve-*

---

* We have recently strengthened the legislative guidelines requirement. Guidelines must now be "sufficient" and "understandable." *See S.D. Migratory Bird Ass'n v. S.D. Game, Etc.,* 312 N.W.2d 374 (S.D.1981); *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559 (S.D. 1981).

*nue,* 331 N.W.2d 828 (S.D.1983); *In re Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). In reviewing the trial court's judgment under the Administrative Procedures Act, we review the entire record as does the trial court. *In re Est. Certain Terr. Elec. Boundaries,* 318 N.W.2d 118 (S.D.1982).

■ Ample evidence was introduced establishing that Custer County Bank and the Custer branch office of First Federal Savings were not adequately meeting the needs of the Custer County public. The Banking Commission so found in Finding of Fact fourteen: "The evidence further shows a lack of adequate service and dissatisfaction with the service by the Custer business community and an absence of choice of banking services in Custer under existing circumstances. The evidence further showed a past growth in bankings debits and deposits in the Custer county area." We are convinced the Commission's decision to allow Southern Hills Bank's application was not clearly erroneous.

■ We are unable to adopt appellants' position that Southern Hills Bank would be opening a branch office in Custer, South Dakota. Conclusion of Law twenty-six provides: "The public convenience and necessity justify and require the organization of such branch bank in Edgemont and the moving of the bank's main office to Custer and its authorization to commence, engage in and carry on the business of banking." Our state legislature has accorded broad discretion to the Commission to recognize when a branch bank is established. SDCL ch. 51; *South Dakota v. Nat'l Bank of South Dakota,* 219 F.Supp. 842 (D.S.D.1963), *aff'd,* 335 F.2d 444 (8th Cir.1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965). *See also, In re Live Stock State Bank, Artesian,* 252 N.W.2d 227 (S.D.1977). We are unwilling to strip the State Banking Commission of its authority. Commission members have expertise in the field of banking. The Commission held extensive hearings and obviously decided on the basis of all the evidence that Southern Hills Bank did not intend to open a branch bank in Custer,

South Dakota. It is the province of the legislature to decide if more precise criteria of a "main office" are advisable. Therefore, we affirm the Commission's decision on this issue.

■ We are also unable to conclude appellants' rights were violated by the admission of the Director's report or the failure to identify the new bank's proposed directors. SDCL 51–16–36 provides in part:

> The records of the division shall be open to public inspection; provided, however:
>
> (1) The director may withhold from public inspection any record for so long as he deems necessary for the protection of a person or bank or to be in the public interest; and

> . . . . .

> Any record of the division shall be made available upon order of a court of competent jurisdiction when cause is shown.

SDCL 51–16–36 specifically and unambiguously provides the director with the power to delete sensitive information from division records. Appellants were well aware of the Director's deletions in his report prior to the hearing. As SDCL 51–16–36 provides, appellants should have petitioned a court for a show cause order if they desired the deleted information. They failed to do so and cannot be heard to complain now at appellate level. Appellants were also free to call the Director as a witness and attempt examination upon the deleted names. We cannot springboard appellants' own failure to comport with our state statute into reversible error.

In *Bank of Glenwood v. Arkansas State Banking Bd.,* 260 Ark. 677, 678–79, 543 S.W.2d 761, 763 (1976), the Arkansas Supreme Court confronted a comparable factual setting:

> The Bank Commissioner later ruled, we think correctly, that certain information in that file, with respect to proposed officers of the new bank, was confidential, and that the release of certain other data would ·give the Bank of Glenwood an unfair competitive advantage over the

new bank. The Commissioner directed that information pertinent to those two matters be removed from the file, with the remaining contents of the file being made available to the appellant. . . .

The appellant also argues that the limitation upon discovery prevented its attorney from adequately preparing to cross-examine . . . .

Justice George Rose Smith, writing for the majority, held the Commissioner had not abused his discretion. Likewise, the North Dakota Supreme Court in *American State Bank v. State Banking Bd.*, 289 N.W.2d 222 (N.D.1980), held information can be deleted or withheld without creating reversible error. These cases illustrate this point: it is one thing to allow or require the Commission to obtain certain sensitive information helpful to the Commission's analysis, and it is quite another matter to require the Commission to mechanically hand over anything and everything to a bank's competitor. The ruinous effect of the latter position should be obvious.

 Public convenience and necessity justify and require the grant of the application of Southern Hills Bank for a charter to conduct business in Custer, South Dakota, as a main office, with a branch bank at Edgemont, South Dakota. Competition is the lifeblood of the banking system and the banking regulatory laws. Banking laws are not intended to give exclusive benefits to institutions which have been granted a license to conduct banking business. Banking laws are regulatory in nature and are not to create a monopoly which stifles the growth of a community. "And the law favors competition in banking," 1 Mitchie, *Banks and Banking,* ch. 1, § 4, at 19 (1973).

Affirmed.

FOSHEIM, C.J., and MORGAN, J., concur.

WOLLMAN and DUNN, JJ., dissent.

WOLLMAN, Justice (dissenting).

SDCL 51–17–15 provides that upon receipt of an application for a bank charter, the Director of the Division of Banking and Finance shall conduct an investigation and examination based on several factors relevant to the proposed bank and its relation to the community in which it desires to be located.

SDCL 51–17–16 provides:

Within one year after the filing of an application the commission shall consider the director's findings and recommendations and all other available relevant information and shall in its discretion approve or disapprove the application, which action shall be subject to appeal.

At the outset of the hearing, Southern Hills Bank offered in support of its application a copy of the Director's report. Appellants objected to the introduction of the report for the reason that deleted from the copy that was offered into evidence were the names of the persons whom the Director had interviewed in compiling the report and recommendation required by SDCL 51–17–15. Interestingly enough, although no explanation was ever offered for this occurrence, Southern Hills Bank had received an unexpurgated copy of the report prior to the hearing.

I agree with appellants that their due process rights to a fair hearing were impinged by the refusal of the Commission to provide them with a complete copy of the Director's report. We have held with respect to the procedure to be followed at hearings in contested cases under the Administrative Procedure Act that:

The requirements of the law then are that where there are adversary parties they are accorded procedural rights that are consonant with due process. "The constitutional guaranty of due process of law applies to, and must be observed in, administrative as well as judicial proceedings, particularly where such proceedings are specifically classified as judicial or quasi-judicial in nature[.]" 2 Am.Jur.2d Administrative Law § 351 (1962).

*Application of Union Carbide Corp.,* 308 N.W.2d 753, 758 (S.D.1981).

As we pointed out in the *Union Carbide* case, SDCL 1–26–18 spells out the rights of

parties at hearings on contested cases, which rights include the reasonable opportunity to inspect all documentary evidence and to examine and cross-examine witnesses. Likewise, SDCL 1–26–19(2) provides that "[a] party may conduct cross-examinations required for a full and true disclosure of the facts."

SDCL 51–16–36 provides in part that:

The records of the division shall be open to public inspection; provided, however:

(1) The director may withhold from public inspection any record for so long as he deems necessary for the protection of a person or bank or to be in the public interest; and

. . . . .

Any record of the division shall be made available upon order of a court of competent jurisdiction when cause is shown.

Whatever the purposes of SDCL 51–16–36, I cannot believe that they include the withholding of information from those parties who have a legitimate interest in objecting to an application for a bank charter. The legislature obviously deemed the report required by SDCL 51–17–15 to be an important part of the Commission's decisional process when acting upon a requested charter. In the absence of equally specific legislative intent authorizing the withholding of the names of those who give information to the Director in the preparation of his report, I would hold that SDCL 51–16–36 does not authorize the Director to withhold information from those parties who object to a proposed charter while at the same time providing complete information to the applicant for the charter.

It is no answer to say that appellants could have called the Director as a witness and thus secured the requested information, for it cannot be presumed that the Director would have divulged more on direct examination than that which he would not vouchsafe prior to the hearing. Likewise, appellants should not have been expected to enlist the aid of the courts to view that which was an integral, essential part of the applicant's case. In contrast to the situation that existed in *Application of American State Bank, Pierre,* 254 N.W.2d 151 (S.D. 1977), appellants objected to the admission of an incomplete report, and appellant Custer County Bank made a written request for the disclosure of the deleted names prior to the hearing. The report appears to have constituted a significant factor in the Commission's decision, for certain of the Commission's findings of fact find no support elsewhere in the record made at the hearing.

I would hold that the Commission should not have received the expurgated version of the Director's report into evidence and that in doing so the Commission trammeled upon appellants' due process rights as recognized in *Union Carbide, supra.*

I also agree with appellants' contention that the evidence submitted by Southern Hills Bank belies its contention that it intends to move its main office to Custer. The Custer office will in fact constitute a branch bank, in violation of SDCL 51–20–4, which prohibits the establishment of a branch bank

in a municipality of less than three thousand population where there is an existing national or state bank regularly transacting banking business, or in any municipality of three thousand population or more and less than ten thousand population where there are two or more existing national or state banks regularly transacting banking business; . . .

(The 1980 census lists the population of Custer as 1,830.).

The state banking statutes do not define the term "main office." In *Application of Live Stock State Bank, Artesian,* 252 N.W.2d 227 (S.D.1977), we affirmed the Commission's finding that the applicant bank did intend in fact to move its main office from Artesian to Mitchell and to establish a branch bank in Artesian, although we did not explicate the evidence in support of that finding or outline any standards by which the term "main office" should be measured. Although Southern Hills Bank contends that "main office" means whatev-

er the Commission says that it means, certainly the Commission must use some established benchmarks against which to determine whether the new charter in the new location will actually represent the location of the main office or whether it is merely a subterfuge to circumvent the prohibition set forth in SDCL 51–20–4.

In *Application of Berkeley Savings & Loan Ass'n,* 115 N.J.Super. 302, 279 A.2d 718 (1971), the state commissioner of banking considered the following criteria in determining whether the proposed site of the financial institution would constitute the "principal" office:

> (a) The office with the highest volume of accounts; (b) the office with the highest volume of loans; (c) the office at which the board of directors regularly meet; (d) the office where the greatest number of senior officers are permanently located; (e) the office to which reports are made and orders emanate; (f) the office which is officially designated as the principal office; (g) the office which is known to the public as the principal office; (h) the office where a majority of the key departments are; (i) the office where the payroll and bookkeeping records are kept.

279 A.2d at 722.

The *Berkeley Savings* criteria, although perhaps not all inclusive, do provide at least some guidelines by which to measure the proposed move in the instant case. When so measured, the proposed bank in Custer fails to meet the definition of "main office." The Edgemont office would have the highest volume of accounts and loans. The greatest number of senior officers would be permanently located in Edgemont. The computer department would remain at Edgemont, servicing the Custer office through telephone lines, just as the Buffalo Gap branch office of the Southern Hills Bank is presently being serviced. The Edgemont bank presently has sixteen employees, and the evidence does not reveal how many, if any, would be transferred to the Custer office or how many employees there would be in the Custer office. In sum, the evidence does not support a finding that the proposed new location would constitute the main office of Southern Hills Bank.

I also agree with appellants that the Commission erred in not requiring Southern Hills Bank to disclose the identity of the proposed directors of the new bank. SDCL 51–17–15(3) clearly requires the Commission to investigate the qualifications of the proposed new directors, and we have made it quite clear that each of the factors set forth in SDCL 51–17–15 must be considered. *Application of American State Bank, supra; Valley State Bank of Canton v. Farmers State Bank of Canton,* 87 S.D. 614, 213 N.W.2d 459 (1973).

The order appealed from should be reversed, and the case should be remanded to the circuit court with directions to set aside the Commission's decision.

DUNN, Justice (dissenting).

An analysis of this case must begin with words of SDCL 51–20–4: "No branch bank shall be established in a municipality of less than three thousand population where there is an existing national or state bank regularly transacting banking business . . . ." The clear policy stated by the legislature is that while creation of branch banks is desirable in large towns, it is neither desirable nor justifiable in small communities (like Custer) where one or more banks are already located.

Because of this policy, the focus of this court's inquiry should be on whether Southern Hills Bank intends to make a *bona fide* interchange of main offices, or merely a "paper change" to circumvent the branch banking statute. *See Ramapo Bank v. Camp,* 425 F.2d 333 (1970), *cert. den.* 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1971). The majority opinion, on the other hand, focuses on the ills of the present Custer bank, rather than on whether Southern Hills' move is actually a branch bank disguised as a main office.

The state banking statutes do not define the term "main office," and a branch bank is simply defined as "a branch place of business maintained by a bank for conduct of banking[.]" SDCL 51–15–1(7). In *Ap-*

**318**

*plication of Live Stock State Bank, Artesian,* 252 N.W.2d 227 (S.D.1977), this court affirmed the finding that the applicant bank actually intended to move its main office from Artesian to Mitchell and to establish a branch in Artesian; unfortunately, we never established a definition of "main office" in that case. Despite this, it is important that some definition or standards be recognized so that other banks in the state cannot use the subterfuge of moving their main office in an attempt to circumvent the limits on branch banking.

The criteria used in *Application of Berkeley Savings & Loan Ass'n,* 115 N.J.Super. 302, 279 A.2d 718, 722 (1971), are quite helpful in defining a "main office":

(a) The office with the highest volume of accounts; (b) the office with the highest volume of loans; (c) the office at which the board of directors regularly meet; (d) the office where the greatest number of senior officers are permanently located; (e) the office to which reports are made and orders emanate; (f) the office which is officially designated as the principal office; (g) the office which is known to the public as the principal office; (h) the office where a majority of the key departments are; (i) the office where the payroll and bookkeeping records are kept.

The facts of the present case indicate that the office in Custer will not actually be a "main office." Only one bank officer will move to Custer; all the other officers and directors will stay in Edgemont. The Edgemont office will have the highest volume of accounts and loans. The important computer department will remain in Edgemont; the Custer office will be serviced by the computer over telephone lines, just as the Southern Hills Bank branch in Buffalo Gap is being serviced. In light of these facts, it appears that there will be no *bona fide* interchange of main offices from Edgemont to Custer. There will be the opening of a branch, similar to the one in Buffalo Gap, thus circumventing the legislative policy set forth in SDCL 51–20–4. While the Banking Commission does have broad discretion in reaching its decisions, as the majority

indicates, this does not include the flaunting of clearly defined legislative policy.

For this reason I would find that the Commission's decision allowing Southern Hills Bank to move its "main office" to Custer is clearly erroneous.