**In the Matter of ESTABLISHING CERTAIN TERRITORIAL ELECTRIC BOUNDARIES WITHIN the State of SOUTH DAKOTA (Aberdeen City Vicinity) (F–3111).**

Nos. 13506, 13508.

Supreme Court of South Dakota.

Argued Feb. 24, 1982.

Decided April 7, 1982.

Merle D. Lewis and Alan D. Dietrich, Huron, Raymond M. Schutz of Siegel, Barnett, Schutz, O'Keefe, Jewett & King, Aberdeen, for appellant Northwestern Public Service Co. in No. 13506.

William A. Bowen of Rice & Bowen, Aberdeen, for appellant Northern Electric Cooperative, Inc. in No. 13508.

S. Walter Washington, Asst. Atty. Gen., Pierre, for respondent South Dakota Public Utilities Commission.

DUNN, Justice.

This case involves the establishment of territorial boundaries for electric utilities in the Aberdeen vicinity. It is before us on appeal for the second time, and we refer to our prior decision for a further statement of the facts. *See Matter of Certain Territorial Elec. Boundaries, Etc.*, 281 N.W.2d 72 (S.D. 1979), hereinafter cited as *Aberdeen Vicinity*.

In *Aberdeen Vicinity*, we determined that the electric lines in the entire disputed area were intertwined. We remanded the matter, therefore, to the Public Utilities Commission (PUC) to determine service area boundaries in accordance with our decision and the statutory guidelines set forth in SDCL 49–34A–44.

On May 15, 1980, the PUC made assignments of territory to Northwestern Public Service Company (NWPS) and Northern Electric Cooperative, Inc. (NEC) without receiving additional testimony. The PUC assigned approximately 29½ square miles of the disputed territory to NEC and 20½ square miles to NWPS, based on the June 22, 1976 recommendations of Willis Jongerius, a consultant engineer from Rock Rapids, Iowa. NWPS appealed to circuit court from the decision and order of the PUC. NEC requested a rehearing with the PUC, which request was denied. NEC then appealed to circuit court. These appeals were consolidated and the circuit court affirmed the decision of the PUC. NWPS ( # 13506) and NEC ( # 13508) appeal separately from the order of the circuit court. We affirm.

■ NEC contends that the appeal of NWPS should be dismissed as untimely because it was not from a final agency decision. We disagree. The PUC entered its decision and order on May 15, 1980. Thirty days later NWPS filed a notice of appeal to the Sixth Judicial Circuit and on the same day NEC filed an application for rehearing with the PUC. Five days later the PUC denied the request for rehearing and NEC subsequently filed a notice of appeal to the Fifth Judicial Circuit. NEC claims that the agency decision was not final until its request for rehearing was denied.

In part, SDCL 1–26–30 provides:

A person who has exhausted all administrative remedies available within any agency or a party who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter. If a rehearing is authorized by law or administrative rule, failure to request a rehearing will not be considered a failure to exhaust all administrative remedies and will not prevent an otherwise final decision from becoming final for purposes of such judicial review.

Under this statute, NWPS's notice of appeal was filed in a timely manner within thirty days after the PUC entered its decision and order. It was not necessary for NWPS to request a rehearing for the purpose of exhausting all administrative remedies, because under the statute the failure to request a rehearing does not prevent an otherwise final decision from becoming final for purposes of judicial review. NWPS filed its notice of appeal on the same day that NEC filed its application for rehearing with the PUC. Since the application for rehearing was not pending at the time NWPS filed its notice of appeal, we find that the appeal by NWPS was filed in a timely manner.

The United States Supreme Court in *American Farm Lines v. Black Ball*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), was confronted with a similar situation, wherein the Interstate Commerce Commission (ICC) granted an application to provide temporary operating authority to a single-line motor carrier service. Petitions for reconsideration were filed and before they were passed upon, some carriers filed suit. The rehearing was subsequently granted. In determining whether the ICC had the power to grant a rehearing while the matter was pending before the District Court, the Supreme Court noted that in multi-party proceedings some of the parties may seek judicial review and others may seek administrative reconsideration. "The concept 'of an indivisible jurisdiction which must be all in one tribunal or all in the other may fit' some statutory schemes, *ibid.*, but it does not fit this one." 397 U.S. at 541, 90 S.Ct. at 1293–94, 25 L.Ed.2d at 554.

*See also United States v. Benmar Transp. & Leas. Corp.*, 444 U.S. 4, 100 S.Ct. 16, 62 L.Ed.2d 5 (1979). Our statutory scheme leaves it to each litigant's choice to determine whether they will seek judicial review under SDCL 1–26–30.2 or administrative reconsideration under SDCL 49–34A–61.1 of a final agency decision. If the petition for rehearing is granted, judicial review may be deferred until the petition has been acted upon, *B. J. McAdams, Inc. v. I.C.C.*, 551 F.2d 1112 (8th Cir. 1977); *Outland v. C.A.B.*, 284 F.2d 224 (D.C.Cir.1960), or the appeal may be remanded to the agency, *Anchor Line Limited v. Federal Maritime Commission*, 299 F.2d 124 (D.C.Cir.1962), cert. denied, 370 U.S. 922, 82 S.Ct. 1563, 8 L.Ed.2d 503 (1962).

■ NEC contends that the trial court erred in denying its affidavit for change of judge. The affidavit alleged that NEC could not have a fair and impartial determination of its appeal before Judge Miller. Under SDCL 15–12–22, a judge may be disqualified if a party to an action files a timely affidavit. The right to change a judge, however, is subject to SDCL 15–12–24, which provides:

The submission to a judge or magistrate of argument or proof in support of a motion or application, or upon trial, is a waiver of the right thereafter to file an affidavit for change of such judge or magistrate by any party or his counsel who submitted the same or who after notice that such matter was to be presented, failed to appear at the hearing or trial. Such waiver shall continue until the final determination of the action and includes all subsequent motions, hearings, proceedings, trials, new trials, and all proceedings to enforce, amend or vacate any order or judgment.

The matter presently before Judge Miller was the continuation of the litigation previously before him in 1977 and this court on appeal in *Aberdeen Vicinity, supra.* Our prior decision in this matter remanded the case to the PUC for assignment of the disputed areas. We stated that: "Such as-

signment shall be made by the PUC, based on its findings, in accordance with this decision." 281 N.W.2d at 77.

Our decision in *Aberdeen Vicinity, supra,* indicates that the remand was not made for the purposes of constituting a new proceeding, but, to the contrary, was a part of and continuation of the original action. *See In re Estate of Scheibe,* 35 Wis.2d 89, 150 N.W.2d 427 (1967); *Luedtke v. Luedtke,* 29 Wis.2d 567, 139 N.W.2d 553 (1966). We hold that NEC waived its right to request a change of judge when it initially submitted to the jurisdiction of Judge Miller in the 1977 proceeding.

NEC contends that the findings of fact and conclusions of law adopted by the PUC were unsupported by substantial evidence on the whole record and were arbitrary or capricious. NWPS contends that the PUC erred in its application of the guidelines of SDCL 49–34A–44 in assigning the disputed territory. We disagree with both of these contentions.

When the initial application was heard, SDCL 1–26–36 provided as follows: *

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

---

* This statute was amended effective July 1, 1978. The standard for review of sufficiency of the evidence was changed from "unsupported

The term "substantial evidence" means "such relevant and competent evidence as a reasonable mind might accept as being sufficiently adequate to support a conclusion[.]" SDCL 1–26–1(8). The fact that there may be substantial evidence in the record to support findings contrary to those made by the agency is not a reason for reversal. Rather, the inquiry is whether the record contains substantial evidence to support the agency's determination. *Nehlich v. S. D. Comprehensive Health,* 290 N.W.2d 477 (S.D.1980); *Dail v. South Dakota Real Estate Com'n,* 257 N.W.2d 709 (S.D. 1977). In reviewing on appeal the circuit court's judgment under the South Dakota Administrative Procedures Act (SDCL ch. 1–26), we must make the same review of the administrative agency's action as does the circuit court, unaided by a presumption that the circuit court's decision is correct. *Matter of Gannon,* 315 N.W.2d 478 (S.D. 1982); *Devericks v. John Morrell & Co.,* 297 N.W.2d 325 (S.D.1980).

This court in *Aberdeen Vicinity, supra,* directed the PUC to determine service area boundaries for the disputed territory according to the guidelines of SDCL 49–34A–44. Those guidelines are as follows:

(1) The proximity of existing distribution lines to such assigned territory, including the length of time such lines have been in existence;

(2) The adequacy and dependability of existing distribution lines to provide dependable, high quality retail electric service;

(3) The elimination and prevention of duplication of distribution lines and facilities supplying such territory;

(4) The willingness and good faith intent of the electric utility to provide adequate and dependable electric service in the area to be assigned;

(5) That a reasonable opportunity for future growth within the contested area is afforded each electric utility.

---

by substantial evidence on the whole record" to "clearly erroneous." *See Aberdeen Vicinity, supra.*

In addition, we directed the PUC to reconsider its prior decision in the following respects:

(1) In determining the utility to which an area should be assigned "the length of time" provision is to be balanced as a priority with the other guidelines found in 49–34A–44 and particularly subparagraph (2) thereof.

(2) That statutory language indicates that in making assignment determinations the PUC should confine its consideration to the territory in dispute according to the guidelines, to the exclusion of concerns outside the disputed territory.

(3) Consideration of the "reasonable opportunity for future growth" condition, found in SDCL 49–34A–44(5), should not involve highly remote and speculative factors such as the PUC finding regarding the estimated energy needs by 1983 for irrigation in the Oahe project.

281 N.W.2d at 77.

By its decision and order, the PUC adopted the recommendation and positions of witness Jongerius. At the initial hearing, Jongerius testified that he used the SDCL 49–34A–44 criteria for establishing boundaries as the basis of his recommendations for the proposed territorial maps. He then summarized each of the criteria listed in SDCL 49–34A–44.

The record is replete with testimony where Jongerius applied the statutory criteria of SDCL 49–34A–44 in making his territorial assignments. For example, he testified that the basis for his boundary line divisions on Exhibit A–1, one of six detailed maps of the area, was primarily to prevent further duplication of facilities. He also considered the factors of longevity of the lines, proximity to existing distribution lines, the adequacy of the existing lines, and growth. In addition, Jongerius stated that both NEC and NWPS could provide adequate and dependable electric service. His testimony with regard to the other five detailed maps of the area indicates that the statutory criteria of SDCL 49–34A–44 were similarly applied to determine territorial assignments.

NWPS and NEC both contend that the "length of time" and "proximity of existing distribution lines" provision, SDCL 49–34A–44(1), was given inadequate consideration and was improperly balanced with the other guidelines of SDCL 49–34A–44. The record indicates, however, that the PUC's findings of fact and Jongerius' testimony at the hearings contain numerous references to "length of time" and "proximity of existing distribution lines" along with the other four factors in making specific assignments of territory. We find that this criterion was given proper consideration.

■ NWPS contends that the growth criterion, SDCL 49–34A–44(5), was given improper weight by the PUC. The record indicates that Jongerius assigned potential growth areas to NEC based on the presence of the 12.5 KV tie line and the desirability of conserving NEC's investment in that line. Similarly, certain areas were assigned to NWPS outside its traditional service area based on conserving its investment in underground installations in the area. NWPS claims that the areas assigned to it have little potential for growth compared to the growth area assigned to NEC. The reasonable opportunity for future growth criterion should not involve highly remote and speculative factors, however. *Aberdeen Vicinity, supra.* While the PUC could consider specific sections, the future growth potential of specific sections could not be a controlling factor in the assignment of territory.

Jongerius referred once to growth potential for NWPS outside the disputed territory. *Aberdeen Vicinity, supra,* specifies that the PUC should not consider concerns outside the disputed territory in making assignment determinations. A review of the record indicates that Jongerius did not give significant weight to the NWPS growth area outside the disputed territory. Therefore, we find that this reference was harmless error.

■ The testimony of Jongerius indicates that he did consider a nonstatutory factor in making his assignment of territory. SDCL 49–34A–44 requires the PUC to make assignments of territory based on the conditions as they existed on March 21, 1975. Jongerius testified that he assigned territory based on the conditions as they existed on the date of the hearing, June 22, 1976. He stated, however, that the lines constructed after March 21, 1975, did not significantly influence his decision.

The findings of fact of the PUC indicate that it carefully reviewed the impact of Jongerius' consideration of post-March 21, 1975 electric systems on the validity of his recommendations. The PUC stated:

The Commission finds that although Staff Witness Jongerius testified that he did take into consideration the electric systems of NWPS and NEC as they existed at the time of the hearing in June, 1976, and not necessarily as they existed as of March 21, 1975, he further testified that the existence of such post-March, 1975, lines did not significantly influence his recommendations. The Commission has carefully reviewed the record on this point, and in particular has examined carefully the maps contained in Exhibit A–1 in order to identify the extent of post-March, 1975, additions to each company's electric systems. The Commission finds that the number and extent of lines added to each company's systems after March 21, 1975, shown on Exhibit A–1 and considered by Staff Witness Jongerius not to be significant additions to those systems as they existed on March 21, 1975. The Commission further finds that the inclusion of those additional lines does not affect the validity of Staff Witness Jongerius' recommended territorial assignments, either overall or on a section-by-section basis.

An examination of the record supports this finding. All of the areas which contained post-March 21, 1975 distribution lines or customers were assigned to a utility which had facilities or customers in the area prior to March 21, 1975, except two. These two areas are adjacent and were served exclusively by NWPS prior to March 21, 1975. After March 21, 1975, NEC acquired a customer in the area and the area was assigned to NEC. The record indicates, however, that Jongerius assigned the area to NEC to square off the boundary lines and as an approximate division of facilities. He recognized that the areas served as a trade-off for other sections awarded to NWPS despite the presence of NEC facilities. The post-March 21, 1975 conditions did not significantly impact the assignment of territory.

■ Jongerius also testified that he, with the assistance of the staff engineer and staff counsel, established five major guidelines. These guidelines were: (1) the elimination and prevention of duplication of facilities, (2) establishment of a reasonably definable and easily identifiable boundary, (3) that the equidistant theory was not applicable, (4) that the PUC may order the transfer of customers from one utility to another, and (5) that the NEC 12.5 KV tie line was eligible for picking up customers if other criteria were met. It was not improper for Jongerius to consider these five guidelines. The first and third guidelines were taken directly from the statutory provisions and our prior decision. The other guidelines were not inconsistent with statutory criteria.

We find that the findings of fact and conclusions of law as adopted by the PUC were supported by substantial evidence on the whole record and were not arbitrary or capricious.

We affirm the order of the trial court.

All the Justices concur.